**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1460

SHAWN MASSEY,

Plaintiff – Appellant,

v.

J. J. OJANIIT, Charlotte-Mecklenburg Police Officer; GERALD
ESPOSITO, Charlotte-Mecklenburg Police Officer; TOM G.
LEDFORD, Charlotte-Mecklenburg Police Officer; JOHN AND
JANE DOES, #1-10, Charlotte-Mecklenburg Police Officers,

Defendants – Appellees.

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte. Robert J. Conrad,
Jr., District Judge. (3:11-cv-00477-RJC-DCK)

Argued: March 19, 2014                    Decided: July 21, 2014

Before MOTZ, KING, and THACKER, Circuit Judges.

Affirmed in part and dismissed in part by published opinion.
Judge King wrote the opinion, in which Judge Motz and Judge
Thacker joined.

**ARGUED:** James Earl Coleman, Jr., DUKE UNIVERSITY SCHOOL OF LAW,
Durham, North Carolina, for Appellant. James P. Cooney, III,
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Charlotte, North
Carolina; Daniel Edward Peterson, CITY ATTORNEY'S OFFICE FOR THE
CITY OF CHARLOTTE, Charlotte, North Carolina, for Appellees. **ON
BRIEF:** Lori R. Keeton, PARKER POE ADAMS & BERNSTEIN, Charlotte,
North Carolina, for Appellees.

KING, Circuit Judge:

In early 2010, plaintiff Shawn Massey was released from a North Carolina prison after a state court in Mecklenburg County struck five verdicts that had been rendered against him in 1999. Following his release, Massey initiated this civil action against officers of the Charlotte-Mecklenburg Police Department under 42 U.S.C. § 1983 and North Carolina law, alleging, inter alia, that they had fabricated evidence that led to his arrest, convictions, and nearly-twelve-year incarceration. The three named defendants — Officers J. J. Ojaniit, Gerald Esposito, and Tom G. Ledford — successfully moved in the district court for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Massey has appealed the court's judgment, and, as explained below, we affirm as to Ojaniit and Esposito and dismiss the appeal as to Ledford.[1]

---

[1] Massey's complaint also asserts claims against "John and Jane Does, #1-10." The district court dismissed those claims without prejudice, invoking our decision in Schiff v. Kennedy. See 691 F.2d 196, 198 (4th Cir. 1982) (explaining that, "if it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention by the court, the court could dismiss the action without prejudice" (footnote omitted)). On appeal, Massey does not contest the dismissal of his claims against the unnamed defendants.

2

I.

On September 23, 2011, Massey filed his complaint in the Western District of North Carolina, alleging § 1983 claims for violation of due process under the Fifth and Fourteenth Amendments, unreasonable seizure and malicious prosecution under the Fourth and Fourteenth Amendments, and conspiracy to contravene his constitutional rights. The complaint also asserts state law claims for obstruction of justice, false imprisonment, malicious prosecution, and conspiracy. Officers Ojaniit, Esposito, and Ledford separately answered the complaint in November 2011, and shortly thereafter each moved for a Rule 12(c) judgment on the pleadings. In their motions, the officers contended that the complaint failed to state any claim against them upon which relief could be granted, and that they were entitled to qualified immunity. Although a magistrate judge recommended granting Ledford's Rule 12(c) motion and denying those of Ojaniit and Esposito, see Massey v. Ojaniit, No. 3:11-cv-00477 (W.D.N.C. Aug. 17, 2012), ECF No. 44 (the "Report"), the district court granted all three motions and dismissed the complaint in its entirety, see Massey v. Ojaniit, No. 3:11-cv-00477 (W.D.N.C. Mar. 29, 2013), ECF No. 52 (the "Order").[2]

_____

[2] The Report is found at J.A. 447-64, and the Order at J.A. 465-94. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

A.

In conducting its analysis, the district court recognized that "Rule 12(c) motions are governed by the same standard as motions brought under Rule 12(b)(6)." Order 12 (citing Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). As such, the court deemed itself obliged to "'accept as true all well-pleaded allegations'" and to "'view the complaint in a light most favorable to [Massey].'" Id. (quoting Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court also observed, however, that it "need not accept allegations that 'contradict matters properly subject to judicial notice or [by] exhibit.'" Id. (quoting Blankenship v. Manchin, 471 F.3d 523, 529 (4th Cir. 2006)).

Open to the district court's consideration were Massey's complaint; the officers' answers thereto; matters of public record; exhibits to the answers (as there were no exhibits to the complaint); and exhibits to the Rule 12(c) motions that were integral to the complaint and authentic. See Order 12-13 (citing Fed. R. Civ. P. 10(c); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009)). The court gave significant attention to the transcript of Massey's 1999 criminal trial, see J.A. 91-436, underscoring that the transcript was "a public record whose authenticity is not in dispute" and had "been submitted as an exhibit [to the officers'

4

answers]." See Order 16 n.4. Additionally, there are repeated references to the 1999 trial transcript in Massey's complaint.

1.

As the complaint, the 1999 trial transcript, and other exhibits reflect, Emerald Bay Apartments resident Samantha Wood contacted the Charlotte–Mecklenburg Police Department on May 22, 1998, and reported that she and her two young children had arrived home at about 10:00 a.m. to find an armed man at the doorway of their apartment. The man held a gun to Wood's eighteen-month-old daughter's head, pushed the family inside the apartment, and attempted to rape Wood. Because Wood was menstruating, the man ceased that pursuit and proceeded to search for money, inducing Wood to hand over sixty dollars from her purse. On then exiting the apartment, the man warned Wood that if she called the police, he would kill her and her family. The man spent approximately thirty minutes in the apartment.

Despite her assailant's threat, Wood called the police, and Officers Ojaniit and Esposito were promptly dispatched to the crime scene. Ojaniit documented Wood's description of the culprit as a 5′9″, 180-pound black man who wore "his hair pulled back from his face and (4) small braids on the back of his head." J.A. 73 (May 22, 1998 report of Ojaniit attached as exhibit to officers' answers). The report further reflects that

5

Wood described the man as wearing a red shirt and blue denim shorts.

The following day, the two officers returned to the 250-unit apartment complex in search of witnesses. The property manager, Theresa Savall, reported that she had encountered a black man in his twenties, approximately 5'11" and at least 165 pounds, as she was walking around the complex between 10:00 and 11:00 a.m. the previous day. Because Savall stated that the man approached her after exiting from the rear patio area of Unit 5038-C, Officer Esposito sought to interview the resident of that apartment, April Pride. After Esposito misinformed Pride that he was investigating a noise complaint, Pride advised Esposito that her friend Shawn Massey had spent the previous night in her apartment. According to Esposito's report, Pride described Massey as being twenty-five years old and "wear[ing] his hair pulled back with 4 or 5 braids." J.A. 75 (May 23, 1998 report of Esposito attached as exhibit to officers' answers). That description was "almost verbatim the same description that Ms. Wood had given of her assailant's hairstyle." Compl. ¶ 19.

Officer Ojaniit thereafter transported Wood to the police station to review a six-photograph array that had been prepared by Officer Ledford and that included a mug shot of Massey taken at the time of a previous arrest. See J.A. 76 (photographic lineup attached as exhibit to officers' answers). Ojaniit

6

showed Wood the lineup, and Wood selected Massey's photo as "looking the most like" her assailant. Compl. ¶ 20 (emphasis added). Ojaniit wrote in his report, however, that Wood said that Massey's photo "looked like the suspect except that the suspect had longer hair with braids and he did not have a beard." J.A. 77 (emphasis added) (May 23, 1998 report of Ojaniit attached as exhibit to officers' answers). Three days later, on May 26, 1998, Ledford presented the same array of photos to Savall, who identified Massey as the person who had spoken to her at the apartment complex on the morning of May 22, 1998.[3]

2.

Based on the witnesses' photo identifications of Massey and Pride's statements placing him near the crime scene, Officer Ledford secured arrest warrants on July 7, 1998, charging Massey with one count each of robbery with a dangerous weapon and felonious breaking and entering, plus three counts of second-degree kidnapping. See J.A. 78-85 (arrest warrants attached as exhibit to answers of Officers Ojaniit and Esposito). On September 8, 1998, a grand jury in Mecklenburg County returned

---

[3] Officer Ledford's report of May 26, 1998, documenting Savall's identification of Massey in the photographic lineup, was attached as an exhibit to Ledford's answer but is not included in the Joint Appendix.

7

five indictments against Massey. See id. at 86-90 (indictments attached as exhibit to answers of Ojaniit and Esposito). Massey was tried on the consolidated indictments about a year thereafter, beginning on September 13, 1999.

During the trial, the prosecution's witnesses included Wood, Savall, Pride, and Officers Ojaniit and Esposito. Wood detailed the events of May 22, 1998, and described her assailant as having "braids in his hair, with five hanging down." J.A. 136. Prompted by the prosecutor to specify whether "the braids [went] all through his hair or were . . . just on the back or just on the sides," Wood testified that the braids "went through." Id. at 137. In other words, Wood indicated that her assailant's hair was braided in what are commonly known as "cornrows." See Compl. ¶ 2. She also stated that her assailant wore a red, jersey-like shirt with hurricane symbols on it. Wood then made a positive in-court identification of Massey as her assailant. According to Wood, although Massey now had short hair, she recognized him from his facial features, height, and voice.

Savall described to the jury the man who had approached her at the Emerald Bay Apartments on the morning of May 22, 1998, explaining that "he was acting kind of hyper" and made comments to her such as, "'Could we go out,'" and "'Baby, you look good.'" J.A. 166-67. Savall testified that the man was wearing

an orange-and-white jersey with long pants similar to jeans — not the red jersey and denim shorts that Wood said her attacker wore. Savall did not notice the man's hair during their three-to-four-minute encounter because he was wearing a hat. More specifically, she did not "recall any braids." Id. at 176. Savall was "fairly certain" that she had accurately recognized the man in the photo lineup, id. at 172, and she made a positive in-court identification of Massey.

Pride testified next for the prosecution, confirming that Massey, her friend of about ten years, had stayed in her apartment on the night of May 21, 1998, and was still there when she left for work the next day, at approximately 6:45 a.m. While being cross-examined by the defense, Pride could not recall Massey ever having braids and stated that Massey wore a "low," or short, haircut, including on May 22, 1998. See J.A. 190-91. Pride's evidence thus conflicted with Officer Esposito's report of his May 23, 1998 interview with Pride, insofar as the report indicated that Pride described Massey as having hair in four or five braids. On redirect examination by the prosecutor, Pride testified that she did not recall having so advised Esposito when he interviewed her. For his part, Esposito testified that he would not have recorded Pride as describing Massey with braids if Pride had not said that in her interview. The trial court gave a limiting instruction with

9

respect to Esposito's report: the jury could consider it for the purpose of corroborating Pride's testimony, "if indeed . . . it does corroborate her testimony," but not "for other purposes." Id. at 206.

Later, during his direct and cross-examinations, Officer Ojaniit was questioned about Wood's identification of Massey in the photographic lineup of May 23, 1998. Ojaniit acknowledged that, although his report reflected that Wood chose Massey's photo as looking "like" the suspect, Wood had actually said that the photo looked "the most like" her assailant. See J.A. 297-98, 304-05. The defense challenged the notion that "looking the most like someone is . . . a positive I.D.," prompting Ojaniit to respond that "that's a question you have to ask [Wood]." Id. at 305.

After the prosecution rested, the defense recalled Pride to the witness stand. She testified that she was "positive" that Massey did not have braids in his hair on May 22, 1998, and she reiterated that she had not made any contrary statement to Officer Esposito. See J.A. 377-78. In addition to Pride, the defense called four of Massey's friends and family members to testify that Massey never wore braids. Another defense witness was Brady Dorsey, the bookkeeper for Massey's employer, Dorsey Concrete. Dorsey, who had known Massey since Massey was a small

10

child, also testified that Massey had never had braids or long hair.

Additionally, relevant to the alibi that Massey sought to establish, Dorsey produced a payroll journal showing that Massey worked eight hours on May 22, 1998, beginning at around 7:00 a.m. Dorsey elaborated that he had transported Massey from Graymont Road (where Dorsey and Massey separately resided) to the job site. According to Dorsey, he and Massey departed Graymont sometime between 6:40 and 6:55 a.m. Dorsey's evidence was thus inconsistent with Pride's testimony, which placed Massey in her apartment several miles from Graymont at about 6:45 a.m.

On September 17, 1999, the jury convicted Massey on all five charges. The trial court thereafter sentenced Massey to 103 to 133 months in prison for robbery with a dangerous weapon, plus a consecutive term of 34 to 50 months for the remaining four offenses. Massey's convictions and sentences were later affirmed by the Court of Appeals of North Carolina. See State v. Massey, No. COA99-557 (N.C. Ct. App. Feb. 20, 2001) (attached as exhibit to Rule 12(c) motions of Officers Ojaniit and Ledford).

3.

In the mid-2000s, the Wrongful Conviction Clinic at Duke University (the "Clinic") began investigating Massey's case.

See Compl. ¶¶ 32-33.  The Clinic obtained a series of mug shots of Massey taken on seven occasions between April 18, 1991, and May 29, 1998.  Each of the photos — including one taken on March 9, 1998 — showed Massey with short hair.  After examining the photos, two professional barbers made affidavits that Massey could not have grown his hair long enough to have it braided in cornrows between March 9, 1998, and the date of the crimes against Wood and her children, May 22, 1998.  Furthermore, according to the barbers, if Massey had cornrows on May 22, 1998, the lines in his scalp left by the braiding would have been visible in his May 29, 1998 photo, but no such lines were apparent.  The Clinic also interviewed Wood and discovered that, despite her unequivocal identification of Massey during the trial, she had expressed doubt to the prosecutor that Massey was her assailant after she first saw him in court, before hearing him speak and further observing him at a pretrial hearing.  Wood's initial reservations were not conveyed to defense counsel.

The Clinic presented its investigation to the District Attorney of Mecklenburg County.  As a result, on May 5, 2010, the prosecutor moved in state court to set aside the jury's verdicts against Massey and have him released from custody.  The motion explained that the evidence uncovered by the Clinic made "it likely that a jury would conclude that although there is

12

substantial evidence placing [Massey] in the area and identifying him as the perpetrator, there is reasonable doubt about whether he committed the offense." J.A. 65 (motion attached as exhibit to officers' answers). In granting the prosecutor's motion, the court concluded that, "[g]iven the totality of the circumstances that now exist[] in this case, if the jury had all the facts that are now available, it cannot be said with certainty that the jury would have reached the same conclusion." State v. Massey, No. 98-CRS-033738(L), slip op. at 4 (N.C. Super. Ct. May 6, 2010) (attached as exhibit to officers' answers). The court therefore struck the five verdicts against Massey and ordered that he be released immediately from custody. Massey was freed that same day.

### B.

In these post-release civil proceedings, the crux of Massey's § 1983 and state law claims is that he was wrongfully arrested, convicted, and incarcerated as a result of the officers' fabrication of evidence. Specifically, Massey's claims are based on two allegedly falsified reports, both of May 23, 1998: Officer Esposito's report that Pride described Massey as "wear[ing] his hair pulled back with 4 or 5 braids," J.A. 75, and Officer Ojaniit's report that Wood stated that Massey's photo "looked like the suspect," id. at 77. By his Report of August 17, 2012, addressing the officers' Rule 12(c) motions,

13

the magistrate judge recommended the dismissal of Massey's claims against Officer Ledford, explaining that the complaint was "completely devoid of any factual allegations that would support claims of wrongdoing" with respect to him. See Report 17. The magistrate judge further recommended, however, that the Rule 12(c) motions of Ojaniit and Esposito be denied, as Massey had "stated plausible allegations of constitutional violations" perpetrated by those two defendants, and it would be "premature to grant their requests for judgment." Id.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, Officers Ojaniit and Esposito timely objected to the Report. Massey responded to Ojaniit's and Esposito's objections, urging the district court to allow his claims against those defendants to proceed. Massey's response explicitly renounced any objection, however, to the magistrate judge's recommendation that the claims against Officer Ledford be dismissed. Massey therefore asked the court to adopt the Report in full.

For the reasons explained in its Order of March 29, 2013, the district court opted instead to grant all three Rule 12(c) motions and dismiss Massey's complaint in its entirety. The court determined, applying the standard of Rule 12(b)(6), that Massey had failed to state a § 1983 claim against Officer Ojaniit or Officer Esposito on which relief can be granted.

14

Accordingly, the court concluded that those officers were entitled to qualified immunity under the first step of the two-step procedure spelled out in Saucier v. Katz, 533 U.S. 194 (2001); under that step, "a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." See Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Fed. R. Civ. P. 12(b)(6), 12(c), 50, 56). Without addressing Massey's acquiescence to the dismissal of his claims against Officer Ledford, the district court similarly ruled that Ledford was entitled to qualified immunity in the absence of any colorable § 1983 claim being stated against him. Finally, again applying the Rule 12(b)(6) standard, the court dismissed the state law claims against all three defendants for failure to state a claim on which relief can be granted.

Massey timely noted this appeal from the district court's judgment, and we possess jurisdiction pursuant to 28 U.S.C. § 1291. He challenges the dismissal of his claims against not only Officers Ojaniit and Esposito, but also Officer Ledford.

## II.

### A.

We begin with Massey's attempt to revive his claims against Officer Ledford. As noted above, Massey unequivocally advised the district court that he did not object to the Report insofar

15

as the magistrate judge recommended the granting of Ledford's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Massey nevertheless now maintains that he can appeal the district court's entry of judgment in Ledford's favor. Our precedent, however, is "replete with warnings that the consequence of failing to file objections [to a magistrate judge's report] is waiver of the right to appeal." Wells v. Shriners Hosp., 109 F.3d 198, 199 (4th Cir. 1997) (listing cases).

It is no help to Massey that the district court conducted a de novo review of the magistrate judge's recommendations with respect to Officer Ledford, because such review cannot cure the failure to properly and timely object. The Supreme Court's decision in Thomas v. Arn, 474 U.S. 140 (1985), is instructive. There, the Court held that "a court of appeals may exercise its supervisory powers to establish a rule that the failure to file objections to the magistrate's report waives the right to appeal the district court's judgment." Thomas, 474 U.S. at 142. The Court also affirmed the Sixth Circuit's application of such a rule to Thomas, who was deemed to have waived appellate review by failing to object to a magistrate judge's report, even though the district court had conducted a subsequent de novo review of the entire record and dismissed Thomas's habeas corpus petition on the merits. See id. at 144-45. We likewise conclude that

16

Massey has waived his right to appeal the judgment in Ledford's favor. Accordingly, we dismiss Massey's appeal as to Ledford.

B.

Next, we review the district court's disposition of the Rule 12(c) motions of Officers Ojaniit and Esposito. As a threshold matter, we address Massey's contention that the court's consideration of the officers' exhibits — particularly the transcript of the 1999 criminal trial — "went far beyond the narrow circumstance in which a court can rely upon documents attached to pleadings without converting a Rule 12(c) motion into one for summary judgment." Br. of Appellant 28. Notably, prior to issuing his Report, the magistrate judge had denied Massey's request to strike the officers' exhibits or, alternatively, to convert their Rule 12(c) motions to summary judgment motions.

Massey's primary grievance with respect to the district court's reliance on the 1999 trial transcript is that the transcript is "'neither a "fact," nor was it construed in the light most favorable to [him].'" Br. of Appellant 29 (quoting Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013)). We recently reiterated in Clatterbuck that, in disposing of a Rule 12(c) motion, "courts may consider relevant facts obtained from the public record, so long as these facts are construed in the light most favorable to the plaintiff along

17

with the well-pleaded allegations of the complaint." 708 F.3d at 557 (internal quotation marks omitted) (citing Fed. R. Civ. P. 12(d)). Contrary to Massey's assertion of error, the district court's consideration of the 1999 trial transcript did not run afoul of Clatterbuck or Rule 12(d). Rather, the court viewed the transcript as a "complete account of the testimony and evidence offered at trial," Order 5 n.2, and recognized that the transcript's presence in the record meant that certain "facts (i.e. the nature of the testimony and evidence offered at trial) are not in dispute," id. at 16 n.4. Significantly, the court refrained from deciding any issue of the 1999 trial and "form[ed] no judgment as to the credibility of any witness." See id. at 5 n.2. Moreover, Massey does not dispute the accuracy or authenticity of the transcript; rather, he extensively quotes from it in his complaint. See Compl. ¶¶ 24-31.

In these circumstances, we approve of the district court's consideration of the 1999 trial transcript, as well as other exhibits to the officers' answers and Rule 12(c) motions, discussed supra Part I.A. Indeed, as part of our de novo review of the court's Rule 12(c) rulings, see Butler v. United States, 702 F.3d 749, 751-52 (4th Cir. 2012), we independently consider those same documents. Cf. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6)

18

dismissal, we may properly take judicial notice of matters of public record. We may also consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." (citations omitted)).

C.

Turning to the merits of the district court's award of Rule 12(c) judgments on the pleadings to Officers Ojaniit and Esposito, our de novo review requires us to apply the standard for a Rule 12(b)(6) motion. See Butler, 702 F.3d at 751-52. In so doing, we are mindful that "[a] Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact." Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014). Like the district court, we are required to accept all well-pleaded allegations of Massey's complaint as true and draw all reasonable factual inferences in his favor. See Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). Nevertheless, we are not obliged to accept allegations that "represent unwarranted inferences, unreasonable conclusions, or arguments," or that "contradict matters properly subject to judicial notice or by exhibit." Blankenship v. Manchin, 471 F.3d 523, 529 (4th Cir. 2006) (internal quotation marks omitted).

In applying the foregoing standards, the complaint will survive only if it "states a plausible claim for relief." See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Because Officers Ojaniit and Esposito have asserted qualified immunity with respect to Massey's § 1983 claims, our inquiry is whether Massey has "plead[ed] factual matter that, if taken as true, states a claim that [the officers] deprived him of his clearly established constitutional rights." See id. at 666. That is, we must take the two-step qualified immunity analysis into account, assessing (1) "whether the facts that [Massey] has alleged . . . make out a violation of a constitutional right," and, if so, (2) "whether the right was clearly established at the time of [the officers'] alleged misconduct." See Pearson v. Callahan, 555 U.S. 223, 232 (2009) (internal quotation marks omitted).

Like the district court, we conclude under the first step of the qualified immunity analysis — with respect to each of Massey's § 1983 claims — that he has failed to state a claim on which relief can be granted, and thus do not proceed to the second step. We also agree with the district court that Massey has not pleaded any colorable state law claim.[4]

---

[4] Following oral argument, Massey moved under Federal Rule of Appellate Procedure 27(a)(1) to file a supplemental brief addressing the significance of Wood's trial testimony clarifying (Continued)

20

1.

The § 1983 claim in Count I of the complaint alleges violations of Massey's right to due process, and thus concerns the alleged use of fabricated evidence at trial to obtain his convictions.[5] The Fourteenth Amendment protects "against deprivations of liberty accomplished without due process of law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation marks omitted). We have recognized a due process "'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.'" Washington v. Wilmore, 407 F.3d 274, 282 (4th Cir. 2005) (quoting Zahrey v. Coffey, 221 F.3d 342, 349 (2d Cir. 2000)); see also, e.g., Halsey v. Pfeiffer, 750 F.3d 273, 295-96 (3d Cir. 2014) ("[B]y fabricating evidence for use in a criminal prosecution, a state actor would violate a

that her assailant wore cornrows, rather there mere braids at the back of his head. We grant that motion and have considered the supplemental brief in rendering today's decision.

[5] The complaint asserts claims against state, rather than federal, actors. Thus, although Count I refers to both the Fifth and Fourteenth Amendments, Massey's relevant due process protections are found in the Fourteenth, rather than the Fifth, Amendment. See, e.g., United States v. Hornsby, 666 F.3d 296, 310 (4th Cir. 2012) (explaining that "the Fourteenth Amendment's Due Process Clause is a limitation on state conduct," while the "due process protections against the federal government are found in the Fifth Amendment").

21

defendant's [Fourteenth Amendment due process] rights regardless of whether or not the state actor violated other constitutional rights of the defendant.").

Fabrication of evidence alone is insufficient to state a claim for a due process violation; a plaintiff must plead adequate facts to establish that the loss of liberty — i.e., his conviction and subsequent incarceration — resulted from the fabrication. See Washington, 407 F.3d at 282-83 (citing Zahrey, 221 F.3d at 349). The plaintiff must also be able to show that, despite any intervening acts of independent decision-makers, the "conviction was a reasonably foreseeable result of [the] initial act of fabrication." Id. at 283 (citing, inter alia, Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial — none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.")). As Judge Motz explained in Evans v. Chalmers, "constitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation." 703 F.3d 636, 647 (4th Cir. 2012).

a.

Beginning with Officer Esposito, we take as true that he fabricated the portion of his May 23, 1998 report recording

22

Pride's statement that Massey wore braids. We thus consider whether Massey has pleaded adequate facts to support a causal connection between that fabrication and his convictions.

At the outset, we must reject the main premise of Massey's case against the officers: that "if [he] did not wear his hair in cornrows on May 22, 1998, he could not have been the armed black man who robbed and kidnaped Ms. Wood and her children." See Br. of Appellant 30-31; see also id. at 20 (asserting that Massey "was exonerated in May 2010, when the equivalent of non-biological DNA excluded him as a suspect in the crimes"). The problem for Massey, as the district court observed, is that he

> raises to the level of certainty that the crime could only have been committed by a person with braids. This is an overstatement of an otherwise valid argument. That an eyewitness described an assailant as having braids does not, by operation of nature or law, exonerate all suspects who do not have braids; it merely calls into question that aspect of the description as applied against anyone not wearing braids. The factors which influence a witness['s] memory and perception are myriad; . . . it is within the realm of possibility that a person can accurately identify another person even as their perception or memory is incorrect as to certain aspects of that person's appearance.

Order 18 n.6. Indeed, although both Wood and Savall identified Massey, they gave different descriptions of the clothes that he wore at the time of the crimes. Such discrepancy did not hinder the jury from finding Massey guilty beyond a reasonable doubt. Similarly, the jury was not swayed by Massey's short-hair

23

defense — perhaps because it believed that Massey in fact had braids, perhaps because it thought that Wood misremembered Massey's hairstyle, or perhaps because it deemed his hair to be non-dispositive in light of Wood's identification of Massey from his facial features, height, and voice.

Simply put, the central issue at trial was not whether Massey had cornrows or any other type of braids. Rather, the prosecution's case focused on the positive in-court identifications made by both Wood and Savall, as well as Pride's testimony contradicting Massey's alibi and placing him at the apartment complex the morning of the crimes. The prosecutor initially did not question Pride about Massey's hairstyle, and addressed Officer Esposito's report only after, on cross-examination by the defense, Pride denied telling Esposito that Massey wore braids. At most, despite the trial court's instruction that it was not to be used for impeachment purposes, the report called Pride's credibility into question. In these circumstances, we agree with the district court that there is not a "sufficiently strong [causal nexus] to bear the conclusion that the statement fabricated by Officer Esposito caused the conviction[s] of Shawn Massey." See Order 20.

We further conclude that Massey's convictions were not a foreseeable consequence of the assumed fabrication. That is, it is not plausible that Officer Esposito could have anticipated

24

that, by falsely stating that Pride told him Massey wore braids, Massey not only would be included in the photographic lineup, but also would be identified by two witnesses (including the victim) — both by photo and in person at trial. In sum, applying well-settled tort principles, we cannot say that the fabrication was a but-for or proximate cause of Massey's convictions. Accordingly, we affirm the judgment in Esposito's favor on Count I.

b.

Turning to Massey's Fourteenth Amendment claim against Officer Ojaniit, we accept that Ojaniit misrepresented Wood's identification of Massey from the photo lineup, omitting the words "the most" from Wood's statement that Massey looked "the most like" her assailant. That misrepresentation, Massey contends, influenced the decisions of the prosecutor, grand jury, and trial jury, thus leading to Massey's convictions and depriving him of due process of law.

We disagree. Even assuming that Wood did not truly identify Massey in the photographic lineup, Savall unequivocally selected Massey's photo, and Pride placed him near the crime scene. Furthermore, Wood positively identified Massey as her assailant at trial. And, in his own trial testimony, Officer Ojaniit mitigated any confusion about Wood's initial identification by accurately presenting Wood's words to the

25

jury. As such, Massey has failed to plead facts to indicate that Ojaniit's fabrication caused his convictions or that the convictions were the reasonably foreseeable result of the fabrication. We thus affirm the judgment on Ojaniit's behalf as to Count I.

## 2.

Next, the § 1983 claim in Count II of the complaint alleges malicious prosecution and unreasonable seizure, and thus focuses on the fabricated evidence's role in securing Massey's arrest and continuing his prosecution.[6] That claim is properly "founded

---

[6] Count II alleges violations of Massey's Fourth Amendment right to be free from unreasonable seizures, a right enforceable against the states by operation of the Fourteenth Amendment. See Camara v. Mun. Court of City & Cnty. of San Francisco, 387 U.S. 523, 528 (1967). The distinction between the Fourteenth Amendment due process claim in Count I (concerning Massey's convictions) and the Fourth Amendment claim in Count II (focusing on his arrest) was recently explained by the Third Circuit:

> The boundary between Fourth Amendment and Fourteenth Amendment claims is, at its core, temporal. The Fourth Amendment forbids a state from detaining an individual unless the state actor reasonably believes that the individual has committed a crime — that is, the Fourth Amendment forbids a detention without probable cause. But this protection against unlawful seizures extends only until trial. The guarantee of due process of law, by contrast, is not so limited as it protects defendants during an entire criminal proceeding through and after trial.

Halsey, 750 F.3d at 291 (citations omitted); see also Jones, 856 F.2d at 994 ("[A]t some point after a person is arrested, the question whether his continued confinement or prosecution is
(Continued)

26

on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution." Lambert v. Williams, 223 F.3d 257, 262 (4th Cir. 2000). To state such a Fourth Amendment claim, "we have required that [1] the defendant have seized plaintiff pursuant to legal process that was not supported by probable cause and [2] that the criminal proceedings have terminated in plaintiff's favor." Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012) (internal quotation marks omitted). As the officers have not contested that Massey was seized or that the criminal proceedings terminated in his favor, we focus solely on their contention that probable cause existed to arrest Massey, even absent the alleged fabrications.

The Supreme Court has long made clear that "an indictment, 'fair upon its face,' returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause." Durham, 690 F.3d at 188–89 (4th Cir. 2012) (quoting Gerstein v. Pugh, 420 U.S. 103, 117 n.19 (1975)). "[N]otwithstanding the conclusive effect" of an indictment, we have stressed that "a grand jury's decision to indict will not shield a police officer who deliberately supplied misleading information that influenced the decision." Id. at 189 (internal quotation marks omitted).

---

unconstitutional passes over from the Fourth Amendment to the due process clause.").

27

Thus, while "intervening acts of other participants in the criminal justice system," such as an exercise of prosecutorial discretion or the return of an indictment, generally "insulate a police officer from liability," Evans, 703 F.3d at 647, officers may be liable to a wrongfully indicted defendant when they have, e.g., lied to or misled the prosecutor, id. at 647-48.

False statements alone do not, however, run afoul of the Fourth Amendment. See Wilkes v. Young, 28 F.3d 1362, 1365 (4th Cir. 1994). To contravene the Constitution, "the false statements or omissions must be 'material,' that is, 'necessary to the finding of probable cause.'" Miller v. Prince George's Cnty., Md., 475 F.3d 621, 628 (4th Cir. 2007) (alteration omitted) (quoting Franks v. Delaware, 438 U.S. 154, 156 (1978)). We determine materiality by "excis[ing] the offending inaccuracies" and then assessing whether the "corrected" evidence, excluding the misstatements, "would establish probable cause." Id. (internal quotation marks omitted). Furthermore, the false statements must have been made "deliberately or with a reckless disregard for the truth," which may be proved by showing that "when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Id. at 627 (internal quotation marks omitted).

28

It is on the materiality requirement that Massey's Fourth Amendment claim falls short. Though Massey alleges that Officers Esposito and Ojaniit deliberately supplied fabricated evidence, he has not pleaded facts adequate to undercut the grand jury's probable cause determination. That is, as the district court determined, even "remov[ing] the fabricated statement attributed to Officer Esposito and add[ing] the word 'most' to Officer Ojaniit's written report, there still exist[ed] sufficient probable cause to arrest Shawn Massey." Order 23 (emphasis omitted). The court further explained with respect to Esposito's fabrication:

> Ultimately, it is a "fair probability" that a suspect had committed a crime where the victim identifies the suspect out of [a] six person photo lineup, a second person independently identifies him (from the same six person lineup) as having been near the scene of the crime during the relevant period, and a third confirms his identity and relates that she last saw him in the vicinity of the crime area several hours earlier. The discrepancies between the description by Wood and Massey's actual appearance, though relevant, do not rise to the level to defeat probable cause. To obtain the warrant, the officers needed only a fair probability that Massey committed the crime against Wood. The multiple identifications of Massey suffice to exceed that threshold.

Id. As to Ojaniit, the court observed that "probable cause to arrest Massey [does not] disappear[] upon the inclusion of the word 'most' in [Ojaniit's] report." Id. at 25. We agree and thus affirm the entry of judgment for Ojaniit and Esposito on Count II.

29

3.

According to the § 1983 claim in Count III of the complaint, the officers conspired to deprive Massey of his constitutional rights. To establish a conspiracy claim under § 1983, a plaintiff "must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 421 (4th Cir. 1996). Because Massey has not stated a claim for deprivation of a constitutional right, his Count III conspiracy claim was properly dismissed as to Officers Ojaniit and Esposito. See Glassman v. Arlington Cnty., Va., 628 F.3d 140, 150 (4th Cir. 2010).

4.

The complaint finally alleges state law claims in Counts IV and V for obstruction of justice, false imprisonment, malicious prosecution, and conspiracy. The district court dismissed Massey's obstruction of justice claim in reliance on our decision in Evans, where we recognized that,

> [e]ven though North Carolina courts have interpreted common-law obstruction of justice to include fabrication of evidence, . . . we have not found — and plaintiffs have not offered — any case from any jurisdiction recognizing a common-law obstruction of justice claim against a police officer for his actions relating to a criminal proceeding.

30

703 F.3d at 658 (citation omitted). We therefore deemed it unrealistic that North Carolina would uphold an obstruction of justice claim in that context. Id. There has been a dearth of North Carolina case law developed since Evans was decided. Therefore, Evans controls this case as well.

Massey's other state law claims fail under the same rationale as their federal counterparts. To sustain a malicious prosecution claim, a plaintiff must establish, inter alia, that the defendant lacked probable cause to initiate the proceeding against the plaintiff. See Best v. Duke Univ., 448 S.E.2d 506, 510 (N.C. 1994). False imprisonment also calls for the absence of probable cause. See Moore v. Evans, 476 S.E.2d 415, 422 (N.C. Ct. App. 1996). As previously shown, the officers possessed ample probable cause to arrest Massey, even absent the fabricated evidence. Thus, Massey has not pleaded the elements essential to a malicious prosecution or false imprisonment claim under North Carolina law. Furthermore, without sufficiently alleged wrongful acts, the conspiracy claim cannot survive. See State ex rel. Cooper v. Ridgeway Brands Mfg., 666 S.E.2d 107, 115 (N.C. 2008). We therefore affirm the district court's dismissal of the state claims alleged in Counts IV and V of the complaint.

III.

Pursuant to the foregoing, we affirm the judgment as to Officers Ojaniit and Esposito, and we dismiss the appeal as to Officer Ledford.

<u>AFFIRMED IN PART
AND DISMISSED IN PART</u>