**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-1182**

———————

JANE DOE,

        Plaintiff - Appellant,

      v.

CHARLOTTE MECKLENBURG BOARD OF EDUCATION; BRADLEY LEAK, individually, as an agent of Charlotte-Mecklenburg Schools, and as a law enforcement officer of Charlotte-Mecklenburg Police Department; ANTHONY PERKINS, individually and in his official capacity as an employee of Charlotte-Mecklenburg Schools; CITY OF CHARLOTTE, a North Carolina Municipality,

        Defendants - Appellees.

———————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:18−cv−00586−RJC−DSC)

———————

Argued: May 7, 2024                            Decided: July 29, 2024

———————

Before RICHARDSON, Circuit Judge, KEENAN, Senior Circuit Judge, and Elizabeth Kay DILLON, Chief United States District Judge for the Western District of Virginia, sitting by designation.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Laura Lynette Dunn, L.L. DUNN LAW FIRM, PLLC, Washington, D.C., for Appellant. Steven Andrew Bader, CRANFILL SUMNER, LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Patrick H. Flanagan, Stephanie H. Webster, CRANFILL

SUMNER, LLP, Charlotte, North Carolina, for Appellee City of Charlotte.  Lori R. Keeton, LAW OFFICES OF LORI KEETON, Charlotte, North Carolina, for Appellee Bradley Leak.  Terry L. Wallace, WALLACE LAW FIRM PLLC, Charlotte, North Carolina, for Appellees Charlotte-Mecklenburg Board of Education and Anthony Perkins.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In 2015, a school resource officer and an assistant principal responded to a report of a student-on-student sexual assault and kidnapping near Myers Park High School in Charlotte, North Carolina.  Based on this incident and the resulting investigations, victim Jane Doe sued the school resource officer, the assistant principal, the City of Charlotte, and the Charlotte-Mecklenburg Board of Education for violations of state and federal law.  Jane Doe challenges on appeal the district court's award of summary judgment to the individual defendants and certain pretrial evidentiary rulings relating to her claims against the City and the Board, as well as the district court's "reduction" of the sanctions recommended by the magistrate judge for the City's and the Board's persistent discovery violations.  After reviewing the record and the parties' arguments, we affirm the district court's judgment.

I.

A.

On the morning of November 3, 2015, Myers Park High School (MPHS) senior Q.W. texted Jane Doe, a junior at MPHS, asking her to skip school with him.[1]  She declined.  At school later that morning, Q.W. again asked her to skip class.  Again, Jane Doe declined.  Around 7:00 a.m., Jane Doe started to walk with Q.W. to her class, "loop[ing] around" near the back entrance to the school.

---

[1] We recite the facts "in the light most favorable" to Jane Doe, "drawing all reasonable inferences" in her favor.  *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022).

3

At that time, school resource officer (SRO) Bradley Leak was directing traffic at the back entrance of the school.[2]  Leak recognized Jane Doe and called to her, stating that he would call her mother.  Q.W. then grabbed Jane Doe's wrist, pulled her away from the school, and told her not to "make a scene."

At 7:02 a.m., Jane Doe sent a text message to a group chat that included her friend "J.D."  Jane Doe texted the group: "I'm being kidnapped," and "Help me."  A few minutes later, Jane Doe also texted her mother (Mrs. Doe) that she was "being kidnapped."  She continued to text the group chat and her mother, asking them to call the police and to report the kidnapping to Leak.

Around 7:26 a.m., J.D. went to Leak's office and told him that somebody had "kidnapped" Jane Doe.  Around the same time, Doe's father (Mr. Doe) called MPHS to report the "kidnapping" to Leak.

Around 7:31 a.m., Jane Doe texted her friends and her mother that she had seen a sign for "Hassell Street."  J.D. shared this information with Leak, who recognized the street as a route that MPHS students would take to the "bamboo forest," an area where MPHS students went "to make out or . . . to fight."

Leak informed Anthony Perkins, an assistant principal at MPHS, of the kidnapping report.  Leak and Perkins left the school in Leak's patrol car to find Jane Doe.

---

[2] At the time of the incident, Leak was a full-time police officer of the Charlotte-Mecklenburg Police Department (CMPD).  He was assigned to work as an SRO at MPHS under a contract between the Charlotte-Mecklenburg Board of Education (the Board) and the City of Charlotte (the City).

4

When Leak and Perkins found Q.W. and Jane Doe walking down a road off campus, Jane Doe was muddy, her glasses were broken, and she had a white stain on her sweater. When she saw Leak and Perkins, she mouthed the word "help." Jane Doe got into the front seat of Leak's patrol car, and Q.W. got into the backseat with Perkins. Leak began to ask Jane Doe what happened but stopped after she expressed concern that Q.W. could hear their conversation. Jane Doe called Mr. Doe from the patrol car, and texted her friends in the group chat, stating, "I was attacked," "I feel so gross," and "If I have aids ima kill myself." Perkins, who had possession of J.D.'s phone, saw Jane Doe's text messages.

When they arrived at the school, Leak and Jane Doe remained in the car. At that time, Jane Doe told Leak that she "was attacked," that she had engaged in oral sex with Q.W., and that she had Q.W.'s "DNA all over" her sweater. When Leak asked Jane Doe "how" Q.W. attacked her, she responded that Q.W. "made [her] do things with him in the woods." Leak then asked Jane Doe whether Q.W. "sexually attacked" her. Jane Doe did not respond.

Once Jane Doe's father arrived at MPHS, Leak took Jane Doe to see him. Leak asked Jane Doe if she "wanted to go through with" filing a report and informed her that "making . . . false charges is a crime." Jane Doe responded, "Yes."

Around the same time, Perkins interviewed Q.W., who described the incident as being consensual. Before Perkins could interview Jane Doe, Doe left the school with her parents to go to the hospital.

Leak and Perkins prepared various reports relating to the incident. Before drafting his initial incident report, Leak reported the incident to his supervisor, and he also spoke

5

with a sergeant in the police sexual assault unit.  Leak initially relayed to the sergeant his conclusion that Jane Doe "felt uncomfortable . . . but . . . did it anyway."  Based on this information, the sergeant told Leak that he "[didn't] have anything."  Later, Leak called the sergeant and told her that Jane Doe is "saying now that [Q.W.] forced her to have oral sex."  Leak also discussed the incident with a detective in the sexual assault unit, who told Leak that he "d[idn't] have a crime."

When Leak prepared his initial incident report, he categorized the incident as "non-criminal."  Leak later supplemented his description of the incident to include additional information, such as J.D.'s report that Jane Doe was "missing" and "in trouble," that Jane Doe had told Q.W. "No," and that Jane Doe had spit Q.W.'s semen onto her sweater.[3]

The day of the incident, Perkins created his own initial report summarizing the events.  Perkins also sent a message to the Board, notifying the Board of the ongoing investigation and noting that the evidence might suggest that the incident was consensual.  The following day, Perkins informed the MPHS principal and the Board that his investigation was "coming to an end" and that he would change the incident finding to "consensual sexual activity."

Before Perkins updated the incident finding, Mrs. Doe told the MPHS principal that she and Jane Doe "[would] not discuss any specifics about the events that took place" and

---

[3] Mrs. Doe filed a complaint with CMPD Internal Affairs, claiming that Leak had falsified this supplemental report.  Following an investigation, her complaint was resolved as "unfounded."

6

"[did] not want to be informed of any outcomes of the school[']s investigation."[4]  After receiving this message, Perkins did not contact Jane Doe about the incident.  Perkins's investigation thus included his interview with Q.W., his review of the security camera footage, his review of the text messages between Jane Doe and Q.W, and his interview of J.D.  On November 9, 2015, the incident finding was changed from a sexual offense to "Mutual sexual contact."[5]

B.

In 2018, Jane Doe sued Perkins, Leak, the City, and the Board for alleged violations of state and federal law.  Following discovery, the defendants moved for summary judgment on Jane Doe's claims for (1) Title IX violations against the Board, (2) 42 U.S.C. § 1983 equal protection violations against Leak and Perkins, and state law claims for (3) negligence against Leak and Perkins, (4) negligent infliction of emotional distress (NIED) against Leak and Perkins, (5) negligent hiring, training, retention, and supervision against the City, and (6) obstruction of justice against Leak and Perkins.[6]

---

[4] Jane Doe and her parents also filed a complaint with the U.S. Department of Education Office for Civil Rights (OCR), alleging that Charlotte-Mecklenburg Schools (CMS) failed to "promptly and equitably respond" to Jane Doe's report of student-on-student sexual assault.  OCR determined that CMS had "conducted a prompt, thorough, and impartial investigation," but that it had failed to provide "written notice" of the outcome of the investigation.  CMS agreed to resolve this failure through an agreement following OCR's identification of this violation.

[5] Q.W. had been removed from classes with Jane Doe and suspended from school for 10 days, but his suspension ended once the investigation concluded.  Jane Doe did not return to MPHS after the incident.

[6] Jane Doe's claims against CMPD Chief of Police Kerr Putney and certain other dismissed claims are not at issue in the present appeal.

7

Before the district court ruled on the summary judgment motions, Jane Doe moved to compel the disclosure of documents related to other sexual misconduct incidents that had occurred in the woods or at MPHS, and moved for sanctions related to the defendants' alleged discovery misconduct (the sanctions motions).  A magistrate judge granted Jane Doe's motion to compel and recommended that the district court grant in part and deny in part her sanctions motions.  On the request for sanctions, the magistrate judge recommended that the district court strike the City's and the Board's motions for summary judgment, and award Jane Doe costs and attorneys' fees incurred in preparing the motions.

The district court adopted the recommendation to award Jane Doe these costs and attorneys' fees.  But the court declined to strike the City's and the Board's motions for summary judgment, and instead denied those motions on the merits.  Turning to Leak's and Perkins's motions for summary judgment, the district court held that they were entitled to public official immunity on Jane Doe's negligence and NIED claims, and that neither Leak nor Perkins intended to hinder Jane Doe from exercising her legal remedies as required for her obstruction of justice claim.  Finally, the court held that Leak and Perkins were entitled to qualified immunity on Jane Doe's § 1983 claim, and awarded Leak and Perkins summary judgment on that claim.

Before the case proceeded to trial on Jane Doe's two remaining claims, namely, the Title IX claim against the Board and the negligent hiring, training, retention, and supervision claim against the City, Jane Doe filed certain motions in limine.  As relevant to this appeal, Jane Doe sought to introduce evidence of Leak's CMPD internal affairs history.  She also requested an adverse inference instruction based on the alleged

8

"spoliation" of video footage from the day of the assault. The district court denied these requests.

The case proceeded to a jury trial on Jane Doe's two remaining claims. After she rested her case, the City moved for a directed verdict on the negligent hiring, training, retention, and supervision claim. The district court granted the motion, explaining that Jane Doe failed to show that the City had actual or constructive notice of Leak's alleged negligence. *See Keith v. Health-Pro Home Care Servs., Inc.*, 873 S.E.2d 567, 575 (N.C. 2022). On the Title IX claim against the Board, the jury determined that Jane Doe had suffered sexual harassment, but that she failed to show that the Board acted with deliberate indifference to such harassment. *See Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 264 (4th Cir. 2021). The court therefore entered judgment for the Board on that claim. This appeal followed.

## II.

On appeal, Jane Doe contends that the district court erred when it (1) granted summary judgment to Leak and Perkins on her obstruction of justice, negligence, NIED, and equal protection claims, (2) denied her requests to introduce Leak's internal affairs history and to give an adverse inference instruction based on the alleged spoliation of video footage, and (3) "reduced" the sanctions recommended by the magistrate judge. We address each argument in turn.

## A.

9

We begin with Jane Doe's contention that the district court erred by awarding summary judgment to Leak and Perkins on her obstruction of justice, negligence, NIED, and equal protection claims. We review de novo the district court's award of summary judgment. *Meyers v. Baltimore County*, 713 F.3d 723, 730 (4th Cir. 2013). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the non-moving party." *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022) (citation and quotation marks omitted). In conducting our review, we construe the evidence in the light most favorable to Jane Doe, the non-moving party, and we do not weigh the evidence or make credibility determinations. *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019).

1.

We first address Jane Doe's obstruction of justice claim. She argues that the district court improperly resolved factual disputes in favor of the defendants when determining that neither Leak nor Perkins had "an intent to impede [her] ability to seek legal remedies." We disagree with this contention.

Under North Carolina law, obstruction of justice occurs when a person does "any act which prevents, obstructs, impedes or hinders public or legal justice." *In re Kivett*, 309 S.E.2d 442, 462 (N.C. 1983). The fabrication or destruction of evidence can constitute obstruction of justice. *See Braswell v. Medina*, 805 S.E.2d 498, 508–10 (N.C. Ct. App. 2017). But an official is not liable for obstruction of justice under North Carolina law

10

unless the official acted "for the purpose of deliberately obstructing, impeding or hindering" justice. *Blackburn v. Carbone*, 703 S.E.2d 788, 796 (N.C. Ct. App. 2010).

Drawing all reasonable inferences in Jane Doe's favor, we note that Leak and Perkins omitted from or misrepresented in their reports certain information, including aspects of Jane Doe's "disheveled" appearance and that J.D. and Jane Doe reported that Q.W. had "kidnapped" and "attacked" Doe. Additionally, after the incident, Leak asked Jane Doe if she "wanted to go through with" filing a report and informed her that "making . . . false charges is a crime."

But the record also shows that Leak requested guidance from his superiors immediately after his conversation with Jane Doe. Moreover, Leak reported the fact that Jane Doe had told Q.W. "No," that Jane Doe's friend had stated that Doe was "missing" and "in trouble," and that Jane Doe had informed Leak that she had spit Q.W.'s semen on her sweater. For his part, Perkins reported that Mrs. Doe had alleged that Jane Doe was "raped," that Jane Doe had mouthed the word "help" to him before getting into Leak's patrol car, and that Perkins had read the text messages Jane Doe sent to her friends while she was in the patrol car, including that Jane Doe was attacked.

We conclude that on this record, despite the alleged factual omissions, inaccuracies, or misrepresentations in Leak's and Perkins's reports and Leak's statement to Jane Doe about the possible consequences of making a false charge, a reasonable jury could not find that either official had the intent required to support Jane Doe's obstruction of justice claim. Put simply, it would be irrational for a factfinder to conclude that Leak and Perkins followed protocol and reported some accurate information about the assault, while

11

simultaneously intending to impede public or legal justice by deliberately concealing, withholding, or misrepresenting similar information.[7]  *See Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 412 (4th Cir. 2022) ("[T]he aim of summary judgment is not to determine the exact strength of a case and dispose of so-called weak cases, but instead to determine whether a rational jury *could* find in the plaintiff's favor such that the case should continue.").  We thus affirm the district court's award of summary judgment to Leak and Perkins on the obstruction of justice claim.[8]

2.

For her negligence and NIED claims, Jane Doe contends that the district court erred by granting Leak and Perkins public official immunity.  We disagree.

Under North Carolina law, a public official is immune from personal liability for claims arising "from discretionary acts or acts constituting mere negligence, by virtue of their office, and within the scope of their governmental duties."  *Bartley v. City of High Point*, 873 S.E.2d 525, 533 (N.C. 2022); *Petrillo v. Barnes-Jones*, 894 S.E.2d 772, 777 (N.C. Ct. App. 2023).  Public official immunity carries a rebuttable presumption of good faith "that loses its force when a party produces competent and substantial evidence that an officer failed to discharge his duties in good faith."  *Bartley*, 873 S.E.2d at 533.

---

[7] Perkins also failed to preserve all MPHS video footage from the day of the incident before it was automatically erased.  But as explained below, this failure does not show Perkins's intent to hinder public or legal justice.  *See infra* Part II.B.2.

[8] Our conclusion on Jane Doe's North Carolina obstruction of justice claim is not altered by her reliance on *Doe v. Fairfax County School Board*, in which we held that a school's receipt of a report or complaint alleging sexual harassment establishes "actual notice" under Title IX.  1 F.4th 257, 268 (4th Cir. 2021).

12

In that regard, "[a]n individual will not enjoy the immunity's protections if his action 'was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt.'" *Id.* (quoting *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012)). The North Carolina Court of Appeals also has recognized that "bad faith" and "willful and deliberate" conduct will "pierce [the] cloak of" public official immunity. *Smith v. Jackson Cnty. Bd. of Educ.*, 608 S.E.2d 399, 411 (N.C. Ct. App. 2005); *Epps v. Duke Univ., Inc.*, 468 S.E.2d 846, 851, 854 (N.C. Ct. App. 1996).[9]

Jane Doe contends that "a reasonable jury could find that [Leak and Perkins] acted in bad faith to mislead officials about [her] appearance and sexual assault reports." But as we explained above in our discussion of the obstruction of justice claim, Jane Doe has not shown that Leak's and Perkins's conduct constituted anything more than mere negligence. Thus, we hold that Jane Doe did not produce the "competent and substantial evidence" required to rebut the presumption of good faith for public official immunity, and we affirm the district court's award of summary judgment on her negligence and NIED claims. *See Bartley*, 873 S.E.2d at 533.

### 3.

In Jane Doe's final challenge to the district court's summary judgment rulings, she contends that the district court erred when it held that Leak and Perkins were entitled to

---

[9] The Supreme Court of North Carolina has not recognized these additional exceptions. *See, e.g.*, *Bartley*, 873 S.E.2d at 533. Nevertheless, in this appeal we assume without deciding that under North Carolina law Jane Doe could rebut the presumption of good faith by showing bad faith or willful and deliberate conduct.

13

qualified immunity on her Fourteenth Amendment equal protection claim.  We also disagree with this argument.

Jane Doe brings this claim under § 1983, which "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *Franklin v. City of Charlotte*, 64 F.4th 519, 530 (4th Cir. 2023) (quoting *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013)).  Under the doctrine of qualified immunity, however, an officer is immune from civil liability if the officer's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Thus, in determining whether qualified immunity is appropriate, we consider whether (1) the officer "violated a federal statutory or constitutional right," and (2) "the unlawfulness of their conduct was clearly established at the time" of the conduct at issue. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 699 (4th Cir. 2018) (citation omitted). We may analyze these prongs in either order to "best facilitate the fair and efficient disposition of each case." *Pearson*, 555 U.S. at 242.  We begin here with the second prong.

"[A] constitutional right is clearly established when its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (citation and quotation marks omitted).  "To be clearly established, a legal principle 'must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority.'" *Hurley*, 911 F.3d at 704 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).  "The precedent must be clear enough that every reasonable

14

official would interpret it to establish the particular rule the plaintiff seeks to apply."
*Wesby*, 583 U.S. at 63.

Here, the relevant inquiry is whether the right to be free from a school official's deliberate indifference toward known student-on-student sexual harassment was clearly established at the time of the alleged misconduct in 2015.[10] We addressed a similar question in *Feminist Majority Foundation v. Hurley*, in which the plaintiffs brought an equal protection claim against the former president of a university. 911 F.3d at 699. There, we held that the plaintiffs had sufficiently alleged that the former president acted with deliberate indifference to the student-on-student sexual harassment suffered by the plaintiffs. *Id.* at 702–03.

Under the clearly established prong of the analysis, however, we concluded that the former president was entitled to qualified immunity because when he allegedly failed to act in 2014 and 2015, he would not have had "fair warning" that his conduct could give rise to an equal protection claim. *Id.* at 704. In reaching that conclusion, we distinguished our 2007 en banc decision in *Jennings v. University of North Carolina*, in which we held that a university administrator could be liable under § 1983 for deliberate indifference to

---

[10] Jane Doe also contends that Leak and Perkins violated her constitutional rights by intentionally withholding or destroying evidence. In support of her argument, she cites *Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019), in which we held that the right "not to be deprived of liberty as a result of the intentional, bad-faith withholding [or fabrication] of evidence by an investigating officer" was clearly established in 1983. 932 F.3d at 241 (citing *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000)). But the Fourth Amendment right discussed in *Gilliam* centered on the withholding or fabrication of evidence in a criminal prosecution. *Id.* Accordingly, that decision would not have put a reasonable school official on notice that his actions could constitute a constitutional violation under the equal protection clause of the Fourteenth Amendment.

sexual harassment. *Id.* at 704–05 (citing *Jennings*, 482 F.3d 686, 701–02 (4th Cir. 2007) (en banc)). We explained that, for two reasons, *Jennings* did not provide "obvious clarity" to school administrators that they could be liable for deliberate indifference to student-on-student sexual harassment. *Id.* at 705. First, the plaintiff in *Jennings* asserted a *supervisory liability* equal protection claim based on a *university employee's* sexual harassment of a student, unlike an equal protection claim based on a school administrator's deliberate indifference to *student-on-student* harassment. *Id.* at 702. Second, we explained that the general right recognized in *Jennings* "to be free from sexual harassment at an educational institution" did not give fair warning to school administrators about the more specific right recognized in *Hurley*. *Id.* at 704–05 ("[W]e must heed the Supreme Court's admonition not to define clearly established law too broadly.").

Consistent with our analysis in *Hurley*, we hold that *Jennings* did not clearly establish the right to be free from a school official's deliberate indifference toward known student-on-student sexual harassment. *See United States v. Seigler*, 990 F.3d 331, 336 n.6 (4th Cir. 2021) ("[I]t is well-settled that a panel of this court is bound by prior precedent from other panels in this circuit absent contrary law from an en banc or Supreme Court decision." (citation and quotation marks omitted)). Moreover, in 2015 there was not a robust consensus of persuasive authority that would have clearly established this right. *See Hurley*, 911 F.3d at 705–06. Finally, because we did not decide *Hurley* until 2018, our holding in that case would not have given fair warning to Leak and Perkins that their conduct could be unconstitutional. *See Wesby*, 583 U.S. at 63 ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.").

16

We therefore affirm the district court's award of summary judgment to Leak and Perkins on Jane Doe's § 1983 equal protection claim.[11]

## B.

Jane Doe next contends that the district court erred when it denied without explanation her motions in limine (1) to admit evidence of Leak's CMPD internal affairs history, and (2) to give an adverse inference instruction for the alleged spoliation of video footage. We review a district court's denial of a motion in limine for abuse of discretion. *United States v. Hornsby*, 666 F.3d 296, 309 (4th Cir. 2012). Under this standard of review, we afford a court's evidentiary ruling "substantial deference, and will not overturn the ruling unless the decision was arbitrary and irrational." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 362 (4th Cir. 2019) (citation and quotation marks omitted). A court abuses its discretion "when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises." *Id.* (citation omitted).

### 1.

---

[11] Relying on *Hope v. Pelzer*, 536 U.S. 730 (2002), Jane Doe also asserts that this is the "rare 'obvious case'" in which the unlawfulness of Leak's and Perkins's conduct was "sufficiently clear" despite the lack of precedent addressing similar circumstances. *See Wesby*, 583 U.S. at 64 (citation omitted). But we do not view the alleged misconduct here as analogous to the egregious circumstances in *Hope*, in which correctional guards chained an inmate to a "hitching post" in the sun without his shirt for seven hours without sufficient water or any bathroom breaks. *See* 536 U.S. at 731, 740–41 (describing the "obvious cruelty" of this treatment as "antithetical to human dignity"). And in the absence of any specific argument as to why Leak's and Perkins's conduct was so clearly unconstitutional that we should disregard our traditional approach, we decline to take that "rare" step here.

17

Jane Doe first contends that the district court erred when it denied without explanation her motion to introduce at trial Leak's CMPD internal affairs history. She asserts that this "arbitrary" ruling was an abuse of discretion, and that Leak's internal affairs history would have provided "direct evidence of the notice requirement" for her negligent hiring, training, retention, and supervision claim against the City under North Carolina law. *See Cloaninger ex rel. Est. of Cloaninger v. McDevitt*, 555 F.3d 324, 337 (4th Cir. 2009) (identifying as an element of negligent supervision actual or constructive notice of the employee's "unfitness or bad habits" (citation omitted)). We reject the contention that the district court's ruling constitutes reversible error.

In denying Jane Doe's request to admit evidence of Leak's internal affairs history, the district court cited Federal Rules of Evidence 401, 402, and 403, but did not provide additional explanation for its ruling. By itself, however, this failure to explain is not an abuse of discretion. Indeed, we have held that "[i]n most contexts, a district court's lack of explanation doesn't amount to error." *Frazier v. Prince George's County*, 86 F.4th 537, 544 (4th Cir. 2023) (explaining that "we often must review district-court decisions with little or no explicit reasoning in front of us"). And here, the record reveals that the district court properly excluded Leak's internal affairs history under Rule 403.

Rule 403 provides that a district court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "[D]istrict courts have broad discretion in making such determinations, which we may overturn only under the

18

most extraordinary circumstances, where that discretion has been plainly abused." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 713 (4th Cir. 2021) (citation and quotation marks omitted).

Leak's CMPD internal affairs history reveals two incidents ██████████ ██████████ that arguably could bear on Leak's potential bias in a sexual assault investigation. But these incidents occurred, or allegedly occurred, outside the workplace more than a decade before the conduct at issue in this case. And in our Rule 403 analysis, we consider whether the district court acted within its "broad discretion" in excluding this evidence. *See id.* Given the limited relevance of these personal events and the inflammatory nature of Leak's internal affairs history, we hold that the district court did not abuse its discretion when it denied Jane Doe's motion to introduce Leak's internal affairs history. *See Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994) (explaining that evidence is unfairly prejudicial under Rule 403 if it could "excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it" (quoting *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1134 (4th Cir. 1988))).

## 2.

Jane Doe also challenges the district court's denial without explanation her request for an adverse inference instruction against the defendants based on the alleged spoliation of MPHS video recordings. She asserts that the defendants failed to preserve MPHS video footage that would have shown that "Q.W. had forced [her] off campus and . . . whether Leak could have intervened." We do not agree that the district court abused its discretion.

19

Spoliation is "the destruction or material alteration of evidence or [] the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). And under Federal Rule of Civil Procedure 37(e), a district court may order sanctions for the failure to preserve electronically stored information. Subsection (e)(1) of that rule permits "moderate" sanctions based on a finding of prejudice, while subsection (e)(2) permits more "severe" sanctions "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Rule 37(e)(1), (2); *Wall v. Rasnick*, 42 F.4th 214, 223 (4th Cir. 2022). An adverse inference instruction, which permits a presumption "that the lost information was unfavorable to the party" who intentionally failed to preserve the evidence, is among the more "severe" Rule 37(e)(2) sanctions. Fed. R. Civ. P. 37(e)(2)(B).

We begin with Jane Doe's contention that the district court abused its discretion by denying her request for an adverse inference instruction "without any fact-finding." In support of her argument, she relies primarily on *Wall v. Rasnick*, in which the plaintiff requested an adverse inference instruction based on the defendants' failure to preserve certain video recordings. 42 F.4th at 217, 223. But *Wall* does not govern the outcome here. In *Wall*, the district court substantially adopted a magistrate judge's order denying the plaintiff's motion for spoliation sanctions without addressing the plaintiff's objections. *Id.* at 217. We held that the district court abused its discretion when it "implicitly" overruled the plaintiff's objections because, among other errors, the magistrate judge

20

"lacked sufficient information to make reasoned determinations regarding any Defendant's knowledge or duty to preserve evidence." *Id.* at 220–22.

Unlike in *Wall*, however, the parties here do not dispute whether the defendants had a duty to preserve the MPHS video footage. And although we observed in *Wall* that the district court had not "made any factual findings regarding prejudice" under Rule 37(e)(1), we do not view that statement as establishing that every failure to make factual findings under Rule 37(e) constitutes reversible error.[12] *See id.* at 223; *see also Frazier*, 86 F.4th at 544 (explaining that only certain rules "requir[e] the district court to make its reasoning known").

The record shows that as part of MPHS's routine operations, the system erased video recordings after about two weeks. Jane Doe had not yet filed this lawsuit during the relevant two-week period, but as investigations into the incident began, Perkins successfully preserved one of the videos before it would have been automatically erased. He was "not sure" what happened to the other videos.[13]

These circumstances underscore the reason for the demanding standard imposed for more "severe" sanctions under Rule 37(e)(2). "Due to the ever-increasing volume of electronically stored information and the multitude of devices that generate such

---

[12] We also held in *Wall* that the magistrate judge erred by analyzing the plaintiff's request under the more stringent "intent" standard of Rule 37(e)(2), without also analyzing the plaintiff's request for "moderate sanctions" under the "prejudice" standard of Rule 37(e)(1). 42 F.4th at 222–23. But here, Jane Doe sought only an adverse inference instruction under Rule 37(e)(2)(B).

[13] We assume for purposes of this appeal that the remaining videos were destroyed and that copies were not produced in this litigation.

21

information, perfection in preserving all relevant electronically stored information is often impossible." Fed. R. Civ. P. 37, advisory committee's note to 2015 amendment. So although the Rule applies whenever electronically stored information should have been preserved in anticipation of litigation and the party failed to take reasonable steps to do so, severe sanctions are reserved for the failure to preserve evidence "with the intent to deprive another party of the information's use in the litigation."[14] *Id.*; Fed. R. Civ. P. 37(e)(2)(B).

Here, the videos were destroyed as a matter of routine procedure, and the record reveals no more than mere negligence in the failure to preserve the footage. Therefore, we reject the contention that Perkins intended to deprive Jane Doe of use of the video footage in litigation. Mindful that courts "should exercise caution" in giving an adverse inference instruction under Rule 37(e)(2)(B), and in light of the district court's "broad discretion" in this regard, we hold that the district court did not abuse its discretion when it denied Jane Doe's request for an adverse inference instruction. Fed. R. Civ. P. 37, advisory committee's note to 2015 amendment; *cf. also Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d

---

[14] In prior cases addressing the spoliation of evidence, we have held that the court may give an adverse inference instruction when the party "knew the evidence was relevant to some issue at trial" and the party's "willful conduct resulted in its loss or destruction." *Buckley v. Mukasey*, 538 F.3d 306, 322 (4th Cir. 2008) (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) (rejecting "bad faith" standard for spoliation of evidence)). But following these decisions, the federal rules were amended to require that, for electronically stored information, an adverse inference instruction be given only if the party failed to preserve the evidence "with the intent *to deprive another party of the information's use in the litigation*." Fed. R. Civ. P. 37(e)(2)(B) (emphasis added); *see also id.* advisory committee's note to 2015 amendment. We apply this latter standard in this case. 28 U.S.C. § 2072; *Hanna v. Plumer*, 380 U.S. 460, 464 (1965).

446, 450 (4th Cir. 2004) ("[T]he refusal to apply a spoliation inference must stand unless it was an abuse of the district court's 'broad discretion' in this regard." (citation omitted)).

C.

Finally, Jane Doe argues that the district court erred by "reducing the sanctions" recommended by the magistrate judge from "two years' worth of attorneys' fees and costs" to only those costs incurred in preparing the two sanctions motions. *See* 28 U.S.C. § 636(b)(1)(A) (allowing district court to reconsider magistrate judge's order if the order is "clearly erroneous or contrary to law"); *see also* Fed. R. Civ. P. 72(a); *Wall*, 42 F.4th at 217. We disagree with Jane Doe's interpretation of the magistrate judge's order.[15]

In the order recommending the imposition of sanctions, the magistrate judge identified the sanctions motions as the "Motions," and then unambiguously referred to those filings in recommending that the defendants be required to pay the attorneys' fees and costs incurred in their preparation. Accordingly, we hold that the district court did not "reconsider" the magistrate judge's order when it awarded those same costs and fees, and we affirm the court's sanctions award.

---

[15] Jane Doe does not challenge on appeal the district court's decision not to strike the City's and the Board's motions for summary judgment, and we reject as waived any argument that the district court's decision not to strike these two motions "obligated [the court] to award the full two years' worth of attorneys' fees and costs" under Rule 37(b)(2)(C). *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

## III.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*